## Armour Grain Company, Appellee, v. United States Grain Corporation, Appellant.

### Gen. No. 30,457.

1. EQUITY—*basis of jurisdiction in matter of accounting.* The jurisdiction of equity in matters of account does not depend upon the existence of a remedy at law, but upon the adequacy and practicability of such remedy and upon the discretion of the court.

2. EQUITY—*possible necessity for examination of books and records of foreign corporations completely to state account as basis for retention of equitable jurisdiction.* It was not error to overrule a demurrer to a bill in equity, based upon the contention that complainant had an adequate remedy at law, where it appeared

that the suit involved a complicated account, for the complete statement of which it might become necessary to examine the books and records of foreign corporations beyond the jurisdiction of a subpoena *duces tecum.*

3. CONTRACTS—*burden of proof as to applicability of trade custom in wheat market to sale by federal licensee under Food Control Act to United States Grain Corporation.* Where wheat was sold to the United States Grain Corporation by a licensee under the Food Administration after the enactment of the Food Control Act and the issuance of regulations thereunder, the burden was upon the seller, in a suit for an accounting in respect of freight refunds collected by the buyer upon reshipment of the wheat, to show that the sale was subject to a trade custom whereby such refunds belonged to the seller.

4. CONTRACTS—*sufficiency of evidence to show sale of wheat by licensee under Food Administration to United States Grain Corporation made subject to trade custom of wheat market.* Sales of wheat to the United States Grain Corporation by a licensee under the Food Administration held not shown to have been made subject to a custom, prevalent prior to the enactment of the Food Control Act and the issuance of regulations thereunder, giving the seller the benefit of freight refunds collectible upon reshipment of the wheat.

5. CONTRACTS—*when United States Grain Corporation not estopped to deny applicability of trade custom of wheat market to sale of wheat by licensee under Food Administration.* United States Grain Corporation held not estopped to deny that it purchased wheat from complainant, a licensee under the Food Administration, without reference to a custom prevalent prior to the enactment of the Food Control Act and the issuance of regulations thereunder, whereby the seller was entitled to the benefit of freight refunds collectible upon reshipment of the wheat, by reason of the fact that in selling wheat itself it retained such refunds, its conduct in so doing being referable to its announced policy in maintaining the fixed price basis which it was the purpose of the statute to establish.

6. LICENSES—*binding effect of federal regulations governing sale of wheat upon licensee under Food Administration.* Where a sale of wheat to the United States Grain Corporation was made after the enactment of the Food Control Act and the adoption of regulations thereunder, by a seller who, as a condition to receiving a license from the Food Administration to deal in wheat, agreed to transact all of its business in accordance with any such regulations then existing or thereafter adopted, such sale was not subject to customs of the wheat trade in existence prior to the enactment of

the Food Control Act, the effect of such enactment and the regulations thereunder being to abolish such customs.

7. CONTRACTS—*when seller of wheat to United States Grain Corporation without right to equitable relief on ground transaction in violation of terms of Food Control Act.* Where the United States Grain Corporation purchased wheat from a licensee under the Food Administration at the price fixed by presidential proclamation, no ground for equitable relief to the seller was afforded by the fact that, on reshipments of such wheat made within one year the buyer was in a position to collect a freight refund, that fact having no bearing upon the price payable for the wheat.

8. EQUITY—*jurisdiction to review reasonableness of federal administrative order abrogating trade custom governing sales of wheat by licensee under Food Administration to United States Grain Corporation.* A court of equity is without jurisdiction, in a suit to secure an accounting by the United States Grain Corporation in respect of a freight refund collected upon reshipment of wheat purchased from a licensee under the Food Administration, to determine the reasonableness of a ruling of the Food Administration whereby such refund could be retained by the buyer, contrary to a trade custom prevalent prior to the enactment of the Food Control Act and the issuance of regulations thereunder, the question whether such ruling was "essential effectively to carry out the provisions of" the Food Control Act being a matter exclusively for the determination of the executive branch of the government.

Appeal by defendant from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1925. Reversed and cause remanded with directions. Opinion filed June 23, 1926.

SHATTUCK, BANGS & WINANT and DEFREES, BUCKINGHAM & EATON, for appellant; EDWIN P. SHATTUCK, GEORGE B. FRANCIS and DON KENNETH JONES, of counsel.

TOWNLEY, WILD, CAMPBELL & CLARK, for appellee; MORRIS TOWNLEY, of counsel.

MR. JUSTICE THOMSON delivered the opinion of the court.

By this appeal the defendant, United States Grain Corporation, seeks to reverse a decree by which the

complainant, Armour Grain Company, was awarded an accounting. Originally, the complainant brought an action at law against the defendant and filed a declaration. Later, conceiving its action to be in equity, it procured an order transferring the cause to the equity side of the court. The order transferring the cause was entered after issue had been joined on the common law pleadings and the motion of complainant to transfer was not objected to by the defendant. After the case had been transferred to the equity side of the court, the complainant filed its bill of complaint, and the defendant filed a general demurrer, which was overruled, and the defendant was ordered to plead. A number of special pleas were then filed by the defendant. On motion of complainant, these pleas were overruled and defendant was ordered to answer the bill and, within the time fixed, the answer of the defendant was duly filed.

We are of the opinion that the defendant's contention that the complainant had an adequate remedy at law is without merit. Not only was a complicated account involved, but the defendant's officers and records were beyond the jurisdiction of a subpoena *duces tecum*. The defendant was a Delaware corporation with its principal office in New York. While such records may not have been essential, they might be very valuable in showing the account, if an account was awarded. If the complainant might have proven the items of the account by its own records, plus certain railroad records, the fact remains that ten different railroads were involved, three of which were nonresident corporations. The jurisdiction of equity in matters of account does not depend upon the existence of a remedy at law, but upon the adequacy and practicability of such remedy and upon the discretion of the court. In our opinion, the situation presented in this case clearly brings it within the rule giving the equity side of the court jurisdiction. *Kirby v. Lake*

*Shore & M. S. R. Co.,* 120 U. S. 130; *Miller v. Russell,* 224 Ill. 68; *Townsend v. Equitable Life Assur. Soc. of United States,* 263 Ill. 432; *Ely v. King-Richardson Co.,* 265 Ill. 148; *People v. Small,* 319 Ill. 437, 444-445; *Mayr v. Nelson Chesman & Co.,* 195 Ill. App. 587, 602.

The record discloses the following facts: In 1918, and for many years prior thereto, the complainant was a corporation engaged in the grain business in Chicago. Most of the grain produced in the United States comes from the west and is transported eastward for consumption in this country or export to foreign countries. Between the time of production and the consumption of a large part of each annual crop of grain, considerable time elapses, during which the grain must be stored. Large facilities for such storage are furnished by elevators and warehouses in Chicago, through which point much of this grain passes. The interval of storage is from one to twelve months. Grain in storage in these elevators and warehouses, having come from various points of production south and west, and destined for points east, is considered in transit during the period of storage, provided it does not continue in storage for a period longer than 12 months. This privilege of storage in transit is known as the transit privilege and by reason of this privilege, grain may be shipped to Chicago from the point of production, and, after an interval of storage there, that grain or other grain, of equal amount, may be shipped to eastern points, at the through freight rate which obtains from the point of original shipment to the point of destination, which through rate is generally less than the sum of the two local rates from the point of original shipment to Chicago and from Chicago to the point of destination, which would apply if the privilege of storage in transit were not available. Prior to the World War, the established custom of handling these grain shipments was that the shipper of the grain, from the

point of production to Chicago, paid the western carrier the local freight rate from that point to Chicago and received the usual form of receipted freight bill. After the interval of storage (less than 12 months), when the grain was to be shipped east, the receipted freight bill was presented by the owner of the grain to a joint agency of western and eastern carriers, known as the Transit Bureau, located in Chicago, and that Bureau placed a notation on the receipt, authorizing the eastern carrier to move the grain to its point of destination in the east, on the basis of the through rate to that point from the original point of shipment. In all such cases there was an agreed division of the through rate between the western and eastern carriers. The proportion of the through rate due the western carrier was known as the "specific" and the proportion due the eastern carrier was known as the "reshipping rate." When the shipper presented a receipted freight bill issued by a western carrier, to the Transit Bureau, for authorization of further carriage east, at the reshipping rate, that bureau would note upon the bill the amount of the refund due the shipper from the western carrier, that refund being the difference between the local rate from the original point of shipment to Chicago and the specific, above referred to.

Where grain, having the transit privilege, changed hands in Chicago, the custom was for the seller to furnish the buyer a receipted freight bill, so that the latter might thereby obtain the reshipping rate thereon, from Chicago to the point of destination, after which, the custom required the buyer to return the bill to the seller, so that the latter might collect the refund due on the bill, from the western carrier.

This right to refund on receipted freight bills of western carriers, where grain had been shipped east on the reshipping rate after the exercise of the privilege of storage in transit, is referred to in the record

as "billing." Two types of sales of grain in the Chicago market were customary—sales "on track" and sales "in store." Sales on track were made either on a "local rate basis," the price paid being for both grain and billing, or on an "Illinois proportional basis," the buyer paying a stipulated price for the grain and another stipulated price for the billing, but in either case, all sales on track, according to the custom, involved the transfer of both grain and billing to the buyer. But where grain was sold in store, the transaction involved the transfer only of the grain, the custom requiring the seller to deliver the receipted freight bill to the buyer, only to enable the latter to obtain the benefit of the reshipping rate from Chicago, east, and thereupon requiring the buyer to return the bill to the seller, so that the latter might obtain the refund from the western carrier.

The United States entered the World War in April, 1917. In August of that year, the Act of Congress known as the Food Control Act, became effective. The enacting clause of that act recited that "by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war, and for the support and maintenance of the Army and Navy, to assure an adequate supply and equitable distribution, and to facilitate the movement of foods;" (and other things which were determined to be necessaries) "to prevent, locally or generally, scarcity, monopolization, hoarding, injurious speculation, manipulations, and private controls, affecting such supply, distribution, and movement; and to establish and maintain governmental control of such necessaries during the war. For such purpose the instrumentalities, means, methods, powers, authorities, duties, obligations, and prohibitions hereinafter set forth are created, established, conferred and prescribed. The President is authorized to make such regulations and to issue such

orders as are essential effectively to carry out the provisions of this Act.''

Pursuant to this act, the President of the United States created the Food Administration. He also made various executive orders and issued various proclamations, the effect of which was to require all persons and corporations engaged in the grain business to operate under a license from the government and subject to the rules and regulations of the Food Administration. Pursuant to these requirements, the complainant, Armour Grain Company, applied to and received from the Food Administration licenses to engage in the storage, sale and distribution of grain, and, in so doing, it agreed to abide by all the laws relating to food control, and proclamations, rules and regulations that might then exist or thereafter be adopted in respect thereto. Thereafter, throughout the remaining period of the war, and during the time the transactions involved in this case were had, the complainant conducted its business under said governmental license and subject to the control prescribed by the Food Control Laws of the United States, the proclamations of the President, relating thereto, and to the rules and regulations adopted pursuant to those laws and proclamations.

Under the authority of the Food Control Act, the President directed the Food Administration to form the defendant corporation. In August, 1917, the defendant was created a corporation under the laws of Delaware. It was first called the Food Administration Grain Corporation, but the name was later changed to the United States Grain Corporation, with a capital stock of $500,000,000, all of which was subscribed, paid for and owned by the United States Government.

By a proclamation issued on August 30, 1917, the President fixed the price of wheat at Chicago, for the crop of 1917, at $2.20 per bushel. In the state-

ment issued by the President in that connection, he called attention to the fact that ''the purchase of wheat and flour for our Allies, and to a considerable degree for neutral countries also, has been placed under the control of the Food Administration.'' He then stated that the price of $2.20 per bushel at Chicago, adopted pursuant to the recommendation of a committee which had been appointed to determine a fair price, would ''be rigidly adhered to by the Food Administration,'' with the expectation that this would ''at once stabilize and keep within moderate bounds the price of wheat for all transactions throughout the present crop year, and in consequence the prices of flour and bread also. The Food Act has given large powers for the control of storage and exchange operations, and these powers will be fully exercised. An inevitable consequence will be that financial dealings cannot follow their usual course. Whatever the advantages and disadvantages of the ordinary machinery of trade, it cannot function well under such disturbed and abnormal conditions as now exist. In its place (that is, in place of the ordinary machinery of trade) the Food Administration now fixes for its purchases a fair price, as recommended unanimously by a committee representative of all interests and all sections and believes that thereby it will eliminate speculation, make possible the conduct of every operation in the full light of day, maintain the publicly stated price for all, and through economies made possible by stabilization and control, better the position of consumers also.'' At the same time, the price of wheat at New York was fixed at $2.30 per bushel and a month later this was changed to $2.28 per bushel.

In September, 1917, the defendant corporation opened an office in Chicago and began buying wheat in the Chicago market, and, among others, from complainant. For the first few months, on all sales of wheat from complainant to defendant, the latter paid

the complainant the price fixed by the Government for the wheat and, in addition, paid the complainant for the billing involved—that is, the defendant paid the fixed price for the wheat purchased, and, in addition, took the receipted western freight bills, attaching to the quantity of wheat purchased, and paid the complainant an additional price therefor, and later the defendant collected the amount represented by the refund due from the western carriers on those freight bills. During this period, one Obermayer, employed by the complainant company since 1903 as traffic man supervising handling of rates and transit arrangements on inbound and outbound grain, was loaned to the Chicago office of the defendant for the purpose of helping to organize its Traffic Department. The bills from complainant to defendant for these western transit refunds were made out in Obermayer's department at complainant's offices, and he testified that at the defendant's offices he "instructed the man handling that work to pay those bills to Armour, and others as well."

On December 1, 1917, the Food Administration and the defendant, as its representative and agent, discontinued the practice of paying the fixed government price for wheat, and, in addition, permitting the seller to receive an additional amount for the right to the refund due on the western freight bills, and a ruling was made and promulgated that thereafter all purchases of wheat made by the defendant would be at the government fixed price, with the condition that the western freight bills be turned over, by the seller of the wheat, to the defendant, who would itself collect and retain all refunds. This ruling was communicated to the defendant's Chicago office by telegram dated November 30, 1917, and reading as follows:

"Starting December first all wheat will be handled basis local freight rate into Chicago, shipper absorbing all charges including switching. Expense bills

must be furnished Food Administration Grain Corporation, who will secure benefit of all difference inbound rates notify receivers promptly."

This telegram was followed by a letter signed by Julius H. Barnes, president of the defendant corporation, to Howard B. Jackson, in charge of defendant's Chicago office:

"Referring to the new ruling by which all wheat sent to Chicago must be delivered on local basis, and any saving in through rate combinations when afterwards forwarded either as flour or wheat, must go to the Grain Corporation in order to hold the scale fairly between country shipper and miller, each of whom would claim this saving."

Jackson was instructed to secure a man for his organization familiar enough with the details to protect the defendant "on every car reaching Chicago, even when directed to the mill, without intermediate elevation." This ruling came to the immediate notice of all Chicago traders in wheat and occasioned a vigorous protest on their part, including complainant, and they all united in an effort to induce those representing the Government in the matter to rescind the rule. Resolutions were passed by the directors of an association known as the Receivers Association of the Board of Trade of the City of Chicago, under date of December 7, 1917, protesting against "the maintenance of this ruling." The reasons given for this protest, as given in the resolutions, were:

"1.  —that it deprives the producer of the right to ship his wheat to the best market.

"2.  —that it reduces the price of wheat to the producer so that he does not get the basic price.

"3.  —that if the buyer is allowed the difference between the proportionate rate and the local rate, it reduces the price to him below the basic price."

A copy of these resolutions was forwarded, by one Kempner, the President of the Receivers Association,

Armour Grain Co. v. U. S. Grain Corp., 241 Ill. App. 332.

to one Stream, "c/o Food Administration Grain Corporation, 42 Broadway, New York City," in a letter dated December 7, 1917, in which the writer also inclosed a statement of one Brown, Manager of the Transportation Department of the Chicago Board of Trade, in regard to the new ruling, and in this letter Kempner requested Stream to "kindly use your best efforts to have this ruling rescinded as it is unquestionably a very pronounced discrimination and must place the Chicago market, as far as wheat is concerned, at a great disadvantage." The statement of Brown, inclosed in this letter, contained a sentence reading: "So far as we have been able to learn, this ruling has been applied at Chicago only and the Chicago Board of Trade protests against its continuance." Kempner added a postscript to his letter, however, referring to the foregoing sentence in Brown's statement, and adding: "I understand now that the ruling applies to all other markets also but, of course, Chicago is the only point that works considerably on a proportional basis and therefore, Chicago is practically the only point affected to any extent." Brown's statement was prepared at the suggestion of George E. Marcy, president of the complainant company, and it was also Marcy's suggestion that Kempner forward it to Stream.

Under date of December 20, 1917, Marcy, as chairman of the Transportation Committee of the Chicago Board of Trade, advised its board of directors that an "argument" on the question of the ruling of the Grain Corporation had been prepared by Brown and turned over to Kempner, who had sent it to Stream, together with the resolution of the Receivers Association "protesting against the rule and asking that it be rescinded." In this communication Marcy added: "Progress in such matters is quite slow, as the Food Administration does not pay a great deal of attention to complaints on these matters, figuring entirely on its

own situation as regards supplies for mills. The matter, however, will be watched most carefully by Mr. Brown."

A reply to the resolutions of protest of the Receivers Association was made under date of December 22, 1917, by Julius H. Barnes. In this communication which was addressed to Kempner, Barnes said:

"We have gone over this situation very carefully, so as not to make a ruling which would discriminate against one community and not affect others. We feel our decision as made is sound and logical, and carries no discrimination, nor injustice, against Chicago, while to grant the request you make would introduce variations in the uniform treatment of communities, and be unfair to them.

"What you ask in effect is this, that you shall be allowed to bill wheat to New York on the through rate, and yet market it on a Chicago market price basis, constructed above the New York basis.

"*    *    * at all points where we have an office, the journey of the wheat is terminated, and the price basis is constructed as terminated at that point. We cannot consent to a trade practice which operated on a different hypothesis.

"To carry out to a logical conclusion what you ask us to do would defeat the stabilized price basis. *    *    *"

Throughout the following year, efforts were continued to induce the defendant and the Food Administration to rescind its ruling and return to a basis of trading in grain which would recognize the peace time customs of private trading, but all those efforts failed and the order was never rescinded. Under date of January 5, 1918, Brown suggested to Marcy a plan by which the traders would refuse to turn over the freight bills to the Grain Corporation "on the ground that if it is a local shipment, the Grain Corporation is not entitled to the freight bill." In this letter he went

on to say: "I thought this might force them to return to the old practice, but I see where the Grain Corporation could retaliate by instructing that the wheat be consigned to them instead of the commission man. We have not very much to lose by fighting the Grain Corporation; our receipts are practically nil, but we should bear in mind what effect throwing down the gauntlet to them would have upon our business next year, should the war continue."

Under date of February 21, 1918, the President of the United States issued another proclamation fixing the guaranteed prices of wheat for the 1918 crop. In this proclamation, he referred to the provisions of section 14 of the Food Control Act requiring him to fix the prices of grain whenever he found that an emergency existed requiring it, and also providing that "the President shall from time to time establish and promulgate such regulations as he shall deem wise in connection with such guaranteed prices, and in particular governing conditions of delivery and payment, and differences in price for the several standard grades in the principal primary markets of the United States." In this proclamation the President announced that he found an emergency did exist, as contemplated in the act, and by virtue of the powers therein granted to him, he fixed the prices of wheat in the 25 primary markets of the country. The price of wheat of the 1918 crop was fixed at $2.20 per bushel in the Chicago market. This price was guaranteed to every producer of wheat, "harvested in the United States during the year 1918, and offered for sale before the first day of June, 1919, to such agent or employee of the United States, or other person as may be hereafter designated." Thereafter, by executive order of June 21, 1918, the defendant was appointed agent of the United States, to make the Government guarantee as to the 1918 wheat crop effective, and "to purchase, hold, transport, store, provide storage

facilities for, sell, dispose of and deliver wheat," as provided in the Food Control Act. By this order the President directed the defendant to "offer and stand ready to purchase, and  *  *  *  purchase to the full extent of its ability and available funds, all wheat tendered to it by any producer thereof at any primary market named in said proclamation of February 21, 1918, at the guaranteed price named therein for such market, provided that, with the approval of the United States Food Administration, the said corporation may pay any higher prices than the guaranteed basis for any grade of wheat in any given market, and may extend its offer to purchase to other holders of wheat on such conditions as it sees fit."

In April, 1918, a conference of the representatives of the grain trade of the United States was held under the auspices of the defendant corporation at the Chamber of Commerce of the State of New York. Marcy, president of the plaintiff company, as well as Barnes, president of the defendant corporation, were present. Again the question of these refunds was brought up and it was represented that the wheat business had been almost entirely taken away from Chicago, "partly by reason of taking away our proportional billing privileges and by reason of our unfortunate price adjustments." But no change in the rule was made.

Marcy testified that in the latter part of June or early in July he had a talk with Jackson, second vice-president of the defendant corporation, in charge of the Chicago office, in which the latter said: "Well, we have the transit fixed now so that we are going to buy it in store, and you can do what you please with your transit. We have also changed the differential so as to allow us to do it," thus implying that thereafter, in buying wheat at the fixed price, the defendant was not going to demand the billing with the wheat. At the time of the trial of this case, Jackson was dead.

That the defendant did not, in fact, change its position with regard to these refunds, at this time, is, in our opinion, clearly established by the evidence in the record.

One Hall, who prepared the "relative market structure which was afterwards promulgated by the Food Administration," and who was "engaged with Mr. Hoover, Mr. Barnes and others in working out a law, rules and regulations and a general structure for the control of food," sent a telegram to Jackson at Chicago, on July 19, 1918, in which he said that "our operation at Chicago on all sales of wheat to us with respect to inbound proportional rates will be exactly as last year. This matter was discussed with Mr. Brown of the Chicago Board of Trade and with Mr. Barnes and Mr. Brown understands the situation thoroughly. In cases where the grain trade handles the wheat in and out, their usual practices will not be interfered with." In a letter from Barnes to Jackson, dated July 23, 1918, he said: "We will not buy and pay for wheat in Chicago, except on the termination of its trip at Chicago, and not pay for it on basis of the balance of a through rate due to deliver it to New York." He told Jackson in this letter that for the present they wanted to ship by lake, "and we are not going to have wheat costing us money based on an unused rail portion." He then said that all intermediate points between Chicago and New York wanted the same thing—namely, wanted defendant to "buy wheat on the New York basis, less the unused portion of the freight for the balance of their journey, and they are in exactly the same position in that respect as Chicago is on this New York billed wheat. We have allowed others to deal in wheat, and if they want to buy it that way, they can, we are not going to. Now, please don't raise this question any more, because it has been carefully considered and decided."

Complainant contends that these communications

could not affect it, as it is not shown that they had any knowledge of them. There is other evidence in the record, to be noted later, which, in our opinion, shows beyond peradventure of reasonable doubt that complainant at all times knew that the defendant at no time receded from the position it took on December 1, 1917, with respect to these refunds. Even if these communications to which we are now referring were not specifically brought to complainant's notice, they do show, in our opinion, that the fact was that the position of the defendant on this question, after July 1, 1918, was the same as it had been prior to that date. The communication last referred to shows that the question again being agitated was the same one which had repeatedly been up before, and in closing the letter, Barnes requests his Chicago representative to please not "raise the question any more because it has been carefully considered and decided."

Barnes testified that shortly after July 1, 1918, Brown called upon him in New York "and wanted to reopen the questioned rule of the ownership of the refund on freight rates," and that he told Brown "the matter had been carefully considered a dozen of times; that the relation of prices between Chicago and other competitive markets was such that a refund of that sort disturbed the stabilized relation of prices and was therefore unfair and that our proposition was the same as expressed to him several times before and we would make no change from that rule." Brown, called by complainant, in rebuttal, admitted having a talk with Barnes on this subject, but put the time in June instead of July, 1918. He testified to what he said in that conversation, and that Barnes replied by saying "he did not want the zone agent to go into any billing arrangement and that he did not want to buy the wheat in Chicago in competition with himself in New York." Brown admitted that he got Hall to arrange this interview with Barnes, telling him that the

object of the desired interview "was to try to save the refunds." He also testified that he "didn't urge Mr. Barnes very much to change his opinion."

The sales of wheat from the complainant to the defendant, which are involved in this case, all took place after July 1, 1918,—in the summer and fall of that year. They aggregated over 13,000,000 bushels and the refunds to which the complainant claims it is entitled, and which were collected by the defendant, aggregate over $46,000. Complainant points out that the billing was not demanded at the time the wheat was delivered to the defendant. The record shows the billing was not needed until the wheat was to be shipped on east. Obermayer testified that the practice was not to deliver the billing until that time. When the defendant did request the receipted freight bills on these sales, they were not turned over at first. Hall testified that he came on to Chicago in November or December, 1918, and had a meeting, which had been requested by the grain trade, and that one McDougal, of the complainant company, with others, was present at that meeting, and that "the discussion at the meeting * * * revolved around a formal demand which I had instructed the Chicago office to make on these grain dealers for the Illinois billing which they were retaining and withholding from the Grain Corporation and the discussion was * * * that they were entitled to it, that the Grain Corporation was wrong. They presented the usual arguments * * * I told them that the matter * * * was for decision by Mr. Barnes and that I would refer the matter to him but that as no new argument had been presented other than those that we had considered when that rule was first made, I could see no hope for a change in the ruling." If any such new arrangement had been made as is claimed to have been indicated by Jackson in the alleged conversation with Marcy, it seems impossible that it would not have been brought up at

this meeting. But the record shows that no mention was made either of such an arrangement or of the alleged conversation.

On December 14, 1918, Jackson, "on instructions from the New York office," made a formal demand in writing on complainant, requesting that it "surrender to this office immediately, all billing covering wheat paid for by the Food Administration Grain Corporation." Barnes had gone to Europe in November, 1918. He returned in January, 1919, and this matter seems to have been raised again, for under date of January 30, 1919, he wrote Jackson saying, "this matter was discussed in our general meeting today and the subject carefully gone over. The conclusion was unanimous that, as to wheat, in which we maintain at Chicago, a stabilized price, we can take no other position than that hitherto maintained."

This question was again urged upon the attention of the defendant by a personal call of McDougal (of the complainant) and others, on Barnes, on February 17, 1919. In this conversation Barnes again insisted that the complainant should surrender the billing in question. Under date of March 19, 1919, he wrote McDougal saying:

"We have carefully considered in this office, from every angle, the request you recently submitted for a revision of our position as to wheat known as the Illinois Proportional Billing.

"We have not decided hastily, nor slighted the question in its various aspects, but are obliged to say that we cannot see sufficient reason for revising our previous position, that this billing, when surrendered to the Grain Corporation, with wheat which the Grain Corporation buys, belongs to the Grain Corporation, and we cannot agree to account for any refunds or readjustment of billing to private parties   *   *   * you will appreciate that this is one angle of the difficulties which arise in any rigid fixation of the market

relations instead of leaving them open to the flexible method of private competition, but this fixation is a vital requirement under a government operation, and being necessary, it becomes also our duty to see that no one point is recognized by us in our purchases in a manner which disturbs the relation fixed by the markets and a recognition of the proportional saving on wheat bought on the fixed Chicago basis would disturb that fair relation."

Barnes sent a copy of this McDougal letter to Jackson, his representative in Chicago, saying, "you will note that we maintain the same position as heretofore, and that the correction of freight, if any, belongs to us."

Finally, the billing in controversy between complainant and defendant was surrendered to the latter by the former, and on March 25, 1919, McDougal, representing complainant, wrote Barnes acknowledging receipt of Barnes' letter of March 19, and saying that it "was presented to those interested at a meeting today, and while all have acquiesced in your decision and have turned over all billing, nevertheless they still feel that by all rules and trade customs, and the contract they have with you, the ownership of this building west of Chicago rests with them. They are, moreover, unanimous in the wish that at some future time, best suited to your convenience, you will reconsider your decision."

In our opinion, it is significant, as urged by the defendant, that even at this time we find no suggestion being made in behalf of complainant; that all these sales of wheat which took place after July 1, 1918, had been made on the basis of the arrangement now claimed to have been made by Jackson, in his alleged conversation with Marcy. It is quite impossible for us to believe that any such arrangement was being retained by Marcy as a secret. On June 1, 1920, Marcy

wrote a letter to Barnes as the United State Wheat Director, in which he said:

"In handling the wheat crop of 1918, you will no doubt remember, there was quite a lot of controversy on the so-called through billed grain in Chicago. Your Chicago officials took what we felt was an arbitrary stand, and refused to give us the benefit of the through bills. The matter was, we believe, referred to New York, and New York decided they would not allow us to have it.

"We felt that this position was not fair and have made up a bill which we enclose amounting to $44,608.-56. We feel this claim should be allowed.  *  *  *

"We appreciate that there is always a difference of opinion in these matters and would be only too glad to have the subject referred to some disinterested people to be mutually agreed upon."

In our opinion, this letter from Marcy to Barnes is so wholly inconsistent with the alleged conversation the former claims to have had with Jackson in June or July, 1918, as to make it quite impossible for us to give the latter any serious consideration.

In support of the decree appealed from, the complainant contends that "defendant must show that it acquired title to the billing" when it made the purchases of wheat involved in this case. With that proposition, we cannot agree. The whole issue in this case is whether or not the custom under which the billing or refunds on western freight bills would belong to the seller, entered into the sales in question. The burden was on the complainant to show by a preponderance of the evidence that such custom did enter into those sales and that the sales were made under the custom. In our opinion, the complainant failed to establish the affirmative of that proposition. By its bill of complaint the complainant alleged that at various times when the defendant was desirous of making shipments of the wheat which was the subject

of the sales in question, it applied to the complainant for receipted freight bills, which would enable defendant to obtain the reshipping rate on the wheat; that this request was made pursuant to the custom referred to and that in recognition of the custom, complainant delivered the receipted freight bills to the defendant, to enable the latter to obtain the reshipping rate upon all wheat sold by complainant to defendant, and that the latter took the receipted bills and obtained the reshipping rates and having received the bills pursuant to the custom, and having obtained the benefit of such custom, defendant became obligated to respect the custom in its entirety, and to return the bills to complainant, so that the latter might collect the refunds due thereon from the western carriers. That these allegations were not supported by the evidence is, in our opinion, entirely clear. The evidence, as above set forth, shows that the complainant not only did not turn the receipted freight bills over to the defendant under the custom which had obtained in the Chicago market before the war, but it refused to turn them over, by reason of the defendant's position that the custom did not apply to these sales because of the war-time regulations, which had been promulgated to cover sales of wheat to the defendant. The complainant withheld these bills as long as possible, because, as Obermayer put it in his testimony:

"We thought we could ignore it (defendant's demand for the bills) until it was settled as to what disposition was going to be made of those refunds."

Complainant contends further that the promulgated ruling of December 1, 1917, did not apply after July 1, 1918, and so did not affect the sales of wheat in question, because that ruling applied only to sales on track; that the defendant initiated the practice of buying grain on track in Chicago on December 1, 1917, and continued to purchase in this way until July 1, 1918, when track buying was discontinued and the

practice of buying in store was initiated. In our opinion, that contention is not borne out by the record. Reference is made to a circular to the trade issued by the defendant on July 1, 1918. That circular not only announced that the defendant would buy at the fixed prices "warehouse receipts in approved elevators at the principal primary markets," as pointed out by complainant, but it also announced that "producers or dealers have the right to ship wheat direct to the Food Administration Grain Corporation at any of the buying points heretofore named." But, in our opinion, the question of whether the defendant was buying on track or in store is not important. The reason why the defendant paid an additional price for the billing up to December 1, 1917, and did not do so after that date, is not to be found in the fact that on that date it changed its plan of buying from the Illinois proportional basis to the local rate basis, as complainant contends. All through this controversy, both in conversations and communications, it is shown that on December 1, 1917, the defendant determined to stop paying for billing, not because the form of its purchases after that date were such as not to call for payment for the billing according to the custom, but because that practice was inconsistent with the maintenance of a stabilized price, and that the latter being its object, it would no longer pay for the billing—custom or no custom. It is impossible for us to read those conversations and communications and come to any other conclusion, and also we are led to conclude that the defendant's position on this question was at all times well known to the complainant. The ruling of the defendant as promulgated December 1, 1917, made no distinction as to sales on track or in store. It stated that thereafter "all wheat" would be handled so that the defendant would secure the benefit of all refunds on freight bills. That position was restated repeatedly and while some

of these restatements were made in intercorporation correspondence, several of them were directed to representatives of complainant personally and others to Board of Trade officials like Brown, who was engaged in a prolonged effort to induce the defendant to rescind its ruling, and that effort was being augmented and closely followed by the complainant's president, as chairman of the Board of Trade Transportation Committee. The sole reason for the ruling and for defendant's repeated refusal to rescind it was that "the relation of prices between Chicago and other competitive markets was such that a refund of that sort disturbed the stabilized relation of prices and was therefore unfair," in defendant's judgment, and interfered with the object and purpose of the Food Control Act and prevented the carrying out of its provisions, by the defendant, which had been created under the law for that purpose.

Complainant points out the fact that when the defendant sold the wheat in store, to millers, during the period in question, it furnished billing to its buyers to enable the latter to obtain reshipping rates, but retained for its own benefit the refund claimed, and it is argued from this that "defendant thus knew the custom applicable to sales in store, and observed such custom when it was the seller, but it claims that the custom was non-existent when it was the buyer." We find nothing in the record indicating that the action of the defendant with regard to these refunds, when it was the seller of wheat, was an observance of the custom referred to, but on the contrary, the record shows that the decision to retain these billing rights as belonging to the defendant—whether the defendant was occupying the position of buyer or seller—and, as Barnes expressed it in a letter to defendant's Chicago office, written 10 days after the ruling was announced —whether the wheat ultimately went forward "as flour or wheat,"—was based on the desire "to hold

the scale fairly between the country shipper and the miller, each one of whom would claim this saving.'' In other words, the defendant deemed it necessary to absorb these refunds itself, if the plan provided for in the Food Control Act, based on the fixed price basis, was to work out properly and attain the ends it sought to accomplish. In doing so, both when it was the buyer and when it was the seller, it was doing so pursuant to its announced rule, and for the reasons given, as noted above, and the fact that when so doing, as seller, it was acting in conformity with the terms of what had been a peace-time custom among private traders, and when doing so as buyer, it was not acting in conformity with the terms of that custom, is, in our opinion, beside the point.

The complainant argues that the customs of the trade in the Chicago market were binding on defendant, whether known or unknown. With that proposition we do not agree. The effect of the enactment of the Food Control Act, the proclamations and executive orders of the President, and the ruling of the defendant, of December 1, 1917, was, in effect, that any and all trade customs in conflict therewith were abrogated and that those who chose to sell to or buy from the defendant must do so on that basis, and, furthermore, the complainant, in taking out and operating under its government license, as it was all during the time the transactions in question were had, agreed so to do.

As we have above stated, we are of the opinion the record abundantly shows that complainant not only knew of the ruling but also the fact that it was never rescinded and always remained in effect after its promulgation in December, 1917. Complainant urges that the contrary is apparent from the fact that it was engaged in business for profit and would not have bought wheat at a certain price, knowing in advance that it was, in effect, going to sell at a lower price, and

Armour Grain Co. v. U. S. Grain Corp., 241 Ill. App. 332.

that unless complainant expected to retain the benefit of the billing there was no possibility of a profit, but on the contrary, there was an absolute certainty of substantial loss. In our opinion the record fails to bear out that contention. There is nothing in the record to indicate that the amount of refunds on western freight bills constituted the profit complainant was to make on its purchases, either in whole or in part. Unless the wheat involved in such purchases ultimately was shipped east, and that, within 12 months, no refunds would ever become available to anybody. Moreover, it is clear that there were other sources of income and profit on complainant's purchases of wheat. Although the storage charges on such wheat, going into complainant's elevators, were borne by complainant up to the time it was sold, one of its own witnesses testified that "after it was sold, it remained in storage in the elevator and the complainant was paid the storage rate." Complainant advances other contentions, in this connection, and we have given them careful consideration, but it will serve no purpose to review them all here.

Complainant contends that the appropriation of the refund claims by the defendant was in direct violation of the terms of the Food Control Act and the presidential proclamations and orders promulgated under the act, in that the effect of that practice was that the defendant paid less than the fixed price for the wheat it purchased from complainant. In our opinion that contention is not sound. The defendant bought and paid for the wheat at the price fixed. That wheat had come into Chicago on a local freight rate. The receipted freight bill for the carriage had a possible right to a refund of an amount depending on the length of the carriage. If the wheat moved forward within a year somebody could collect that refund. The defendant, acting, in our opinion, within its powers as a governmental agency, under the terms of

the Food Control Act and the presidential proclamations and orders issued pursuant to its terms, took the position that it must retain those refund rights itself, in order to accomplish the stabilizing of the price of wheat, as between all the interests concerned. In so doing, in our opinion, the price the defendant was paying for wheat was in no way affected.

Nor may we concern ourselves with the question of whether the ruling of the defendant was reasonable or sound. *Dakota Central Tel. Co. v. State of South Dakota ex rel. Payne,* 250 U. S. 163, 184. Whether that ruling was "essential effectively to carry out the provisions of" the Food Control Act, was a matter for the exclusive determination of the executive branch of the Government, acting through the Food Administration, under the provisions of the act, and its decision upon that matter is not subject to judicial review, and consequently is not here in issue. *Dexter & Carpenter v. United States,* 275 Fed. 566, 570; *Ex parte Willman,* 277 Fed. 819.

Complainant contends further that there is no reason of public policy why defendant should not perform its contracts literally as they were made. We do not understand that defendant is contending the contrary, as counsel for complainant state is the case. That question is in no way involved, in our opinion. The question rather is, what was the contract entered into? It is shown by the record, as we have endeavored to point out, that the contracts represented by the sales of wheat in controversy were not based on the pre-war custom which had prevailed in private dealing, but were based on the proposition contained in the ruling promulgated on December 1, 1917. That ruling was effective and binding on all concerned. *Haas v. Henkel,* 216 U. S. 462; *United States v. Birdsall,* 233 U. S. 223; *Leonard v. Lennox,* 181 Fed. 760; *Maresca v. United States,* 277 Fed. 727; *Roxford Knitting Co. v. Moore & Tierney,* 265 Fed. 177.

The Food Control Act was war-time legislation. It granted the executive department of the government extraordinary powers. In exercising those powers and carrying out the purposes and effecting the objects of the act, in part through the defendant corporation as a governmental agency, that department was acting clearly within the powers granted.

"The defendant, although, in form, a private corporation, and liable to be sued as such, was organized and owned by the United States as an agency for public service, (and) was not engaged in ordinary merchandising, but under Mr. Hoover's directions, was performing public functions arising out of the War and its sequels." *United States Grain Corp. v. Phillips,* 261 U. S. 106.

For the reasons we have given, we are of the opinion that the Armour Grain Company has no interest in the refunds in question and that the chancellor erred in entering a decree requiring the United States Grain Corporation to account to it for them.

The decree of the superior court is, therefore, reversed and the cause is remanded to the superior court with directions to dismiss the bill for want of equity.

*Decree reversed and cause remanded with directions.*

Taylor, P. J., and O'Connor, JJ., concur.