UNITED  STATES  GRAIN  CORPORATION  *v.* PHILLIPS.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 290.  Argued January 23, 1923.—Decided February 19, 1923.

1. The right of a naval officer to a percentage on gold received on board and carried as freight, upon his responsibility (Rev. Stats., §§ 1624, 1547; Navy Regulations [1913] Art. 1510) did not attach to gold held and shipped by the United States Grain Corporation, as an agency of the United States, and the obligation to

carry which, upon the same terms as property of the United States, was recognized by the Secretary of the Navy.  P. 113.

2. It was immaterial in such case, that the legal title to the gold was in the Grain Corporation and that the corporation, in other relations, might be treated as a distinct personality whose property was subject to execution.  P. 113.

279 Fed. 244, reversed.

ERROR to a judgment of the Circuit Court of Appeals for the plaintiff, entered upon motion of the defendant (the present plaintiff in error) after that court had reversed a judgment directed for the defendant by the District Court, in an action to recover compensation for transporting gold.

*Mr. Garrard Glenn,* with whom *Mr. William B. Walsh* and *Mr. DeWitt C. Jones, Jr.,* were on the briefs, for plaintiff in error.

The case is appealable to this Court.

Apart from the statute and regulations upon which plaintiff relies, it is clear that he must show a contract, express or implied in fact, between himself and the defendant, binding the latter to pay freight for the transportation of gold on a vessel which the plaintiff did not own.

There was no express contract to pay for the carriage of the gold.

No contract can be implied from the regulation, because it had been duly suspended.  But even if the regulation had not been suspended, still there can be no implication of a contract, because, (*a*) the plaintiff was under orders to carry the gold, and (*b*) the circumstances negatived any intention of the defendant to contract or to express any desire to do so.

Neither the statute nor the regulation inherently binds the defendant; they are disciplinary in their nature and apply only to persons who are members of the naval forces.

The statute and regulation are permissive merely; they allow the officer to make a contract, but do not create one for him. They were not intended to give the plaintiff even permission to make a charge to a coördinate agency of the Government like the defendant.

Even if the regulation were mandatory and applicable to the defendant, it could not operate because it had been duly suspended.

*Mr. Harold N. Whitehouse,* with whom *Mr. Edward S. Hatch* and *Mr. Maurice W. Clarke* were on the brief, for defendant in error.

The right of a commanding officer to receive compensation from the person who places gold on board his ship for freight is provided for by law.

The Secretary of the Navy is without power to suspend the provisions of Art. 1510, Navy Regulations, or to issue an order inconsistent with the provisions of § 1624, Rev. Stats.

The Secretary's order purporting to suspend the provisions of Art. 1510 was not intended to and did not apply to plaintiff in error or its gold.

The gold in question was not taken on board the "Laub" and transported to New York pursuant to an order issued by the Secretary.

The Secretary's order made the suspension of Art. 1510 depend upon certain conditions precedent, which were not complied with.

Neither the conditions imposed by the order, nor the rights provided by § 1624, Rev. Stats., and Art. 1510, were waived by the commanding officer.

The order of the Secretary purporting to suspend the provisions of Art. 1510, not having been approved by the President, was invalid.

The transaction between the United States Grain Corporation and the Government of Bulgaria was private, not governmental.

Mr. Justice Holmes delivered the opinion of the Court.

This is a suit to recover fifty-two thousand dollars, being one per centum of the value of gold carried from Constantinople to New York upon the steamship Laub, a destroyer in the Navy, of which the plaintiff, the defendant in error, was commanding officer at the time. There was a trial in the District Court in which, after the evidence was in, both sides moved for the direction of a verdict and the Court directed a verdict for the defendant. The judgment was reversed by the Circuit Court of Appeals, 279 Fed. 244, and the facts not being in dispute, judgment was ordered for the plaintiff on motion of the defendant in order to secure an earlier review here.

By Rev. Stats., § 1624, establishing Articles for the Government of the Navy, in Article 8 (13) the receiving on board of gold, silver, or jewels, and the demand of compensation for carrying them are excepted from the general prohibition there contained. Article 1510 of the Navy Regulations (1913) provides that when gold, &c., shall be placed on board any ship for freight or safe keeping the commanding officer shall sign bills of lading for the amount and be responsible for the same; that the usual percentage shall be demanded from the shippers, one-fourth of which goes to the commander in chief if he signifies to the commander of the ship in writing that he unites with the latter in the responsibility for the care of the treasure. In that case the commander of the ship gets one-half, otherwise two-thirds. By Rev. Stats., § 1547, the Regulations adopted with the approval of the President, as the foregoing was, shall be recognized as the Regulations of the Navy, "subject to alterations adopted in the same manner." The plaintiff founds his claim upon these laws and rules. Naturally, therefore, he does not question the defendant's right to bring the case to this Court. Act of March 3, 1911, c. 231 (Judicial

Code), §§ 241, 128.  *Spiller* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 253 U. S. 117, 121.  *Howard* v. *United States,* 184 U. S. 676, 681.

The defendant, although in form a trading corporation organized under the laws of Delaware, was formed in pursuance of an Executive Order dated August 14, 1917, as an agency to enable the United States Food Administration to buy, store and sell wheat, among other things. The stock, except the shares necessary to qualify seven directors, was all subscribed for and owned by the United States.  Even the directors' shares were held by the United States, endorsed in blank.  The stock ultimately was $500,000,000.  By an Executive Order of June 21, 1918, the defendant was designated an agency of the United States under the control of the United States Food Administrator, Mr. Hoover, to buy, hold and sell wheat. These orders were issued under the war powers conferred upon the President by the Act of August 10, 1917, c. 53, 40 Stat. 276.  A later Act of February 25, 1919, c. 38, 40 Stat. 1161, made a large appropriation to furnish foodstuffs for the relief of populations outside of Germany, German-Austria, Hungary, Bulgaria, and Turkey, &c. This was carried out by an Executive Order of March 1, to the effect that the furnishing should be conducted under the direction of Mr. Hoover, who was authorized to establish the American Relief Administration to that end, and particularly to employ the Food Administration Grain Corporation as an agency for transporting and distributing foodstuffs and supplies to the populations requiring relief.  Finally, an Act of March 4, 1919, c. 125, 40 Stat. 1348, to protect the United States against undue enhancement of its liabilities under its guaranties of the prices of wheat, &c., authorized the President to make necessary orders and to utilize any department or agency of the Government including the Food Administration Grain Corporation.  Pursuing this act, on May 14, 1919,

the President authorized the defendant to buy and sell wheat of the crops of 1918 and 1919, and reciting that the defendant was formed as an agency of the United States and that its functions would be substantially complete on June 30, 1919, ordered it to close its books and make a complete report as of that date, change its name to that which it now bears, and to perform such duties thereafter as the President might direct.

We mention these details to show that the defendant although in form a private corporation and liable to be sued as such, was organized and owned by the United States as an agency for public service, was not engaged in ordinary merchandizing, but under Mr. Hoover's directions was performing public functions arising out of the war and its sequels. *The Western Maid,* 257 U. S. 419, 432. This being its relation to the Government it made a contract with Bulgaria for the sale of wheat under which Bulgaria forwarded the gold in question by a naval vessel of the United States to Constantinople for the defendant. On August 8, 1919, Admiral Knapp, the ranking naval officer of the United States in South European waters, cabled to the Secretary of the Navy that the Relief Administration desired to ship about five millions gold to the United States, and was willing to release the captain from all responsibility except that usually incumbent for care of public property. He asked if the Department would suspend the mandatory provisions of Article 1510 Navy Regulations including percentage charge, and direct that shipment be received for transportation as desired. On August 16 the Secretary answered that the Department suspends the above mentioned provisions with release for commanding officer and the United States, as offered. On September 10, 1919, the plaintiff was ordered by Captain Greenslade, his senior in rank, to take the gold in question on board from the United States Ship Galveston where it then was, and to transport it to New York. At the

same time he was informed of the Secretary's cable. On the 15th the plaintiff took the gold on board the Laub. On the same day, Major Galbraith purporting to act under authority of Mr. Hoover offered the plaintiff a release in the above terms with a copy of the Secretary's cable. The plaintiff handed back a written reply addressed to Major Galbraith, "Officer in Charge, U. S. Food Administration, Constantinople," saying that he could not accept the release and that he took full responsibility for the gold. On the same day the plaintiff received from Admiral Bristol, in command in Turkish waters, an order purporting to direct the plaintiff to proceed to New York and to authorize him to receive the gold, stated to be the "property of the United States Food Administration (Grain Corporation)." The order added that in accordance with Article 1510, Navy Regulations, the Admiral assumed joint responsibility with the Commanding Officer, but called attention to the cable from the Secretary which was attached.

On the facts thus abridged the plaintiff argues that it is entitled to judgment as matter of law. Some preliminary objections may be dispatched in few words. It is said that the Secretary's order did not apply to this gold, because the request to him spoke of the Relief Association as wishing to ship; that the Relief Association had no power to sell to Bulgaria, that country being excepted in the Act of February 25, 1919, which we have mentioned; that the release by Mr. Hoover, United States Food Administrator, was inadequate, and that the authority of Major Galbraith did not appear. We agree with the District Judge that the authority of Major Galbraith was fully established. Whether the sale to Bulgaria was *ultra vires* or not the gold belonged to the defendant as fully as any other money received by it, and the relations between the defendant and the Relief Association were such that it did not matter whether the one or the other

was named to the Secretary of the Navy. But these questions are immaterial in our view and we deem it apparent that the plaintiff's refusal had no reference to any of them, but was intended and purported politely to repudiate the Secretary's authority no matter how accurately given. We gather that the Admiral and the Captain meant to try a fall with the Secretary, on the supposed authority of the law.

The plaintiff's position at the time probably was the same that he takes now and that prevailed with the Circuit Court of Appeals. He took the order of the Secretary according to its face as an attempt to suspend the Regulation and thought that it was invalid without the actual approval of the President. It is suggested also that it was an unauthorized diminution of the plaintiff's compensation as established by the law. *United States* v. *Symonds,* 120 U. S. 46. But in our opinion the view taken by the District Judge was more accurate. The plaintiff did not stand as a private person making a private contract with a business corporation. He was an officer of the United States charged with duties as such. In substance the gold was the property of the United States. It is true that the legal title was in the Corporation, that the property of the Corporation might have been taken to pay a judgment against it, and that in other ways the difference of personality would be recognized. *Sloan Shipyards Corporation* v. *United States Shipping Board Emergency Fleet Corporation,* 258 U. S. 549. But for purposes like the present imponderables have weight. When as here the question is whether the property was clothed with such a public interest that the transportation of it no more could be charged for by a public officer than the carrying of a gun, we must look not at the legal title only but at the facts beneath forms. The facts we have indicated in stating the case. The very existence of the

Corporation was created to carry on activities required by the war. Its property was held for that and no other end. It was admitted at the argument, and of course could not be denied, that if the United States had been the legal owner of the gold the plaintiff would have been acting only in the course of his duty in carrying it. We are of opinion that the same thing is true here. The order of the Secretary embodied no suspension of the Regulation but only a recognition of the fact that this was not a service for which the plaintiff was entitled to charge. His acceptance of the characterization of · his act by the cable that he answered did not change the legal effect. It simply accepted a wrong reason for a right result.

> *Judgment reversed.*
> *Judgment of the District Court affirmed.*