## RICHMOND HOSIERY MILLS v. CAMP.
### No. 758.

District Court, N. D. Georgia.
May 18, 1934.

M. Neill Andrews, Asst. U. S. Atty., of Atlanta, Ga., and Curley C. Hoffpauir, Asst. Counsel, National Recovery Administration, of Washington, D. C., for defendant.

UNDERWOOD, District Judge.

Complainant, a manufacturer of hosiery, having plants located in Georgia and Tennessee and doing an interstate business, filed this bill against Lawrence S. Camp, United States Attorney, seeking to enjoin him from prosecuting complainant for violation of the National Hosiery Code, or otherwise attempting to enforce against it the provisions of the National Industrial Recovery Act (48 Stat. 195) "in so far as said Act or any code or regulation thereunder might impose a limitation or restriction in the operation of complainant's productive machinery." Complainant alleged that it, "along with other hosiery manufacturers, met in several sessions for the purpose of agreeing upon * * * a code of fair competition for the hosiery industry * * * in an effort to follow out the purposes of said Act"; that on July 12, 1933, a "preliminary draft of a basic code of fair competition for the hosiery industry was approved at a meeting of" the National Association of Hosiery Manufacturers, of which complainant was and is an active and influential member, "by the majority of the manufacturers assembled in conference"; that "the terms agreed upon were protested by the plaintiff as being unreasonable" and as restricting its "use of certain of its machinery by more than fifty per cent in hours, and consequently resulted in actually reducing the number of persons employed because the machinery, subject to the code provisions said to be applicable, would stand idle."

Subsequently, the National Association of Hosiery Manufacturers, claiming to represent 80 per cent. of the hosiery industry, submitted a proposed basic code of fair competition to the National Recovery Administration, which in turn arranged for a public hearing at which "an opportunity to be heard (either in person or by duly appointed representative either by appearance or by sending a written or telegraph statement)" was given "to all persons or groups who can show a substantial interest as workers, employers, consumers or otherwise in the effect of any provision of proposed code."

Notice of the time and place of said hearing was given to all concerned, including complainant. Hearings were duly held, at which complainant was represented by its president, who also presented complainant's contentions directly to President Roosevelt

Sutherland, Tuttle & Brennan, of Atlanta, Ga., John A. Chambliss, of Chattanooga, Tenn., and J. Alton Hosch, of Gainesville, Ga., for plaintiff.

prior to his approval of the Code, and "the Administrator having rendered his report containing an analysis of the code of fair competition, together with his recommendations and findings, respectively, thereto, and the Administrator having found that the said code of fair competition complied in all respects with" the National Industrial Recovery Act, the President, on August 26, 1933, adopted and approved "the report, recommendations and findings of the Administrator" and ordered "that the said code of fair competition be and it is hereby approved."

Complainant avers that it fully complied with all the provisions of the Code until the 17th day of October 1933, and has since complied with all provisions, except section 6 of article 4; that it has since said date complied with all code provisions in all of its plants except the Rossville Mill and has complied with all of them at that mill with the exception that it has refused to comply with said section 6 in so far as it forbids the operation of complainant's knitting machines at Rossville more than two shifts a day, because to so limit their operation would necessitate the discharge of about twenty of the employees operating them, which would in turn displace approximately one hundred and fifty other employees engaged in subsequent operations, and would cause it great loss and be an unconstitutional invasion of its rights.

Said section 6 of article 4 of the Code is in the following language: "The productive operations of a plant shall not exceed two shifts of forty (40) hours each week. The work week for productive operations, except dyeing, shall not exceed five (5) days of eight (8) hours each. These days shall be Monday to Friday, inclusive, except in those states where the laws operate to prevent the operation of two forty (40) hours shifts within the mentioned five (5) days. In such states, the employer may operate one shift on Saturday, not to exceed four (4) hours, it being definitely understood that his total machine hours shall not exceed eighty (80) hours per week."

Complainant contends that section 3 of article 1 of the National Industrial Recovery Act (15 USCA § 703), authorizing the establishment of Codes of fair competition, and the above-quoted section 6 of article 4 of the Code, are unconstitutional if held applicable to it.

Since complainant attacks the constitutionality of the act itself, this question must be first determined, because an injunction should be granted as prayed if this contention is correct. Kennington v. Palmer, 255 U. S. 100, 41 S. Ct. 303, 65 L. Ed. 528.

The act by its own terms limits its application to transactions "in and affecting interstate or foreign commerce." 15 USCA § 703 (b). Congress' power is supreme in this field, so there can be no question of the constitutionality of the exertion of this power if done in a manner authorized by the Constitution.

It is claimed, however, that this undisputed power has been exerted unconstitutionally because Congress has attempted to delegate its legislative authority to the President and certain unofficial groups and provided a method of enforcement of the act which deprives complainant of its property without due process of law and has created a criminal offense without defining the crime with sufficient explicitness to inform those who are subject to the penalties imposed what conduct on their part will render them liable to such penalties.

■ Of course, it is settled that the legislative power of Congress cannot be delegated, but it is equally well settled that Congress may "declare its will, and, after fixing a primary standard, devolve upon administrative officers the 'power to fill up the details' by prescribing administrative rules." United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 53 S. Ct. 42, 44, 77 L. Ed. 175; Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481.

The National Industrial Recovery Act, in section 1 (15 USCA § 701), declares the existence of a national emergency, announces the legislative policy "to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices," etc., and, in section 2 (15 USCA § 702), authorizes the President, in order to effectuate this policy, to accept and utilize such voluntary and uncompensated services and to appoint such officers and employees as he may find necessary. Sections 3 and 7 of the act (15 USCA §§ 703, 707) authorize the President to approve codes of fair competition which meet the minimum express requirements specified therein (as in section 7), and which he finds "will tend to effectuate

the policy" of the act as declared by Congress and are not designed to promote monopolies or to eliminate or oppress small enterprises or discriminate against them and to have been presented by truly representative groups. Provision is also made for a hearing, prior to approval by the President, of any Code, not only of those represented by associations or groups, but of all others interested.

It will be seen that the act provides for a hearing of all interested parties, findings of facts by the President, and approval and adoption by him of the Code based upon such findings before the Code becomes effective. When these conditions have been met, as they have been in this case, the Code becomes binding upon the industry and "any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor." Section 3 (f) of title 1 of the act, 15 USCA § 703 (f).

The Code thus becomes effective upon the findings and authority of the President, as his act, and not by virtue of the acts of any other officer or group, though he may, as expressly authorized by the act, utilize such agents and agencies as he may deem necessary in making his investigations and in reaching his decision.

As stated in United States v. Grimaud, 220 U. S. 506, 517, 31 S. Ct. 480, 483, 55 L. Ed. 563: "It must be admitted that it is difficult to define the line which separates legislative power to make laws, from administrative authority to make regulations. * * * But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress."

█ The National Industrial Recovery Act may not have been drafted in full detail or with technical exactness, but "Regard must be had * * * where constitutional limits are invoked, not to mere matters of form, but. to the substance of what is required." Crowell v. Benson, 285 U. S. 22, 53, 52 S. Ct. 285, 293, 76 L. Ed. 598.

One of the express purposes of the act is "to eliminate unfair competitive practices," and it is not shown that the means selected are not reasonably adapted to serve that purpose.

In the recent case of Petersen Baking Co. v. Bryan et al., 290 U. S. 570, 54 S. Ct. 277, 279, 78 L. Ed. 505, the court said that: "The state Supreme Court held that a secondary purpose of the act is to prevent unfair competition by dishonest bakers resulting in injury to the consuming public. As there is no showing that the measure is not reasonably calculated effectively to serve for that purpose, the judgment upholding the act must be affirmed."

█ I think the case at bar comes well within the rule relating to the delegation of legislative authority as stated in the above cases, and as applied in many other cases, and find that there has been no unconstitutional delegation of legislative power to the President in the National Industrial Recovery Act. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; United States Grain Corporation v. Phillips, 261 U. S. 106, 43 S. Ct. 283, 67 L. Ed. 552; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435; Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993; Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; Sears, Roebuck & Co. v. Federal Trade Commission (C. C. A.) 258 F. 307, 6 A. L. R. 358; Frischer & Co. v. Elting (C. C. A. 2d) 60 F.(2d) 711.

The Supreme Court further held, in Petersen Baking Co. v. Bryan, supra, "that where one complains that regulations promulgated under legislative authority" by an administrative board "are unreasonable and oppressive, he should seek relief by applying to that board to modify them." While complainant asserts that it protested certain provisions of the Code, the minutes of the meeting of the National Hosiery Association do not support this contention, but show that the adoption of article IV of the Code, which includes the now contested section 6, was moved by Mr. Andrews, complainant's president and representative at the meeting, and that all the provisions of the Code, except article V, were then adopted. (Minutes, pp. 103, 104.) Whether objections were made or not, it does not appear that complainant exhausted its administrative remedies, either with the National Hosiery Association, the Code Authority, or the President, but on the other hand participated in the adoption of the Code and actually accepted and complied with the Code for a number of weeks after its promulgation.

This would apparently bring the case within the recent ruling of the United States Circuit Court of Appeals for the Fifth Circuit in the case of Yarnell et al. v. Hillsborough Packing Co. et al., 70 F.(2d) 435, de-

cided April 14, 1934, though my decision does not rest alone on this proposition, wherein the court say: "The Hillsborough Packing Company signed the marketing agreement. That agreement was designed as a part of a general plan, the central idea of which is the co-operation of growers and shippers of the citrus-producing states to the end that better prices may be realized by prorating, allotting, and restricting interstate shipments. The act provides that such agreements shall be lawful notwithstanding the anti-trust laws. The validity of that provision is not assailed, and so the marketing agreement, being legal, is enforceable, even though other provisions of the act may be invalid. * * * The conclusion from this must be that it presents no case for relief in a court of equity. The bill as to it should be dismissed."

If the National Industrial Recovery Act is constitutional as a valid regulation of interstate commerce and the delegation of authority to the President to put into effect the Hosiery Code approved by him does not amount to an unconstitutional delegation of legislative power, then the regulation of interstate commerce effectuated by such Code, if not unreasonable, arbitrary, or capricious, would not be unlawful because it might work a hardship on some individuals or affect some more than others, and would not be a violation of the Fifth Amendment of the Constitution.

The Supreme Court, in the case of Nebbia v. People of State of New York, 54 S. Ct. 505, 510, 78 L. Ed. 940, 89 A. L. R. 1469, decided March 5, 1934, say:

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given. * * *

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to

the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts. * * *

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases."

The court in this case further say: "Laws passed for the suppression of immorality, in the interest of health, *to secure fair trade practices,* and to safeguard the interests of depositors in banks, have been found consistent with due process." (Italics ours.)

This principle has been recognized in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 S. Ct. 96, 44 L. Ed. 136, and in many other Supreme Court decisions.

That the regulations provided in the Hosiery Code are not unreasonable, arbitrary, or capricious, and that the means selected by Congress to effectuate its purpose has a real and substantial relation to the object to be attained, will appear below in the discussion of another phase of this case.

■ The National Industrial Recovery Act is not subject to the objection that it too vaguely defines the crime which it creates. It sufficiently defines "a primary standard" and criminal violation of the act does not arise until one has violated a provision of a Code with respect to a transaction in or affecting interstate commerce, which, in the case at bar, is very definite and puts every one on notice of exactly what he will be charged with. This meets the requirement of law as stated by the Supreme Court. J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; United States Grain Corporation v. Phillips, 361 U. S. 106, 43 ,S. Ct. 283, 67 L. Ed. 552; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435; Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993; Tagg Brothers & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294.

We may next consider complainant's contention that, though the act may be constitutional if properly construed, a construction making it applicable to complainant would render it unconstitutional because the transactions of complainant sought to be prohibit-

ed are wholly intrastate and neither interstate commerce nor affecting interstate commerce.

While admitting that it is engaged in interstate transactions which fall within the definition of interstate commerce, nevertheless it maintains that the particular provisions of the Code sought to be enforced against it relate to transactions (to wit, operation of knitting machines more than two shifts a day) which are wholly intrastate and over which the Federal government has no power.

It is settled by clear authority that manufacturing alone, within a single state, is not commerce and that the fact that the things manufactured are to be afterwards shipped or used in interstate commerce does not make their production a part thereof. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929.

It results, therefore, that section 6 of article 4 of the Hosiery Code cannot be sustained as a federal law under the Commerce Clause of the Constitution (Const. art. 1, § 8, cl. 3), unless it appear that the regulation in question, prohibiting the operation of knitting machines more than two shifts a day, is one regulating transactions "affecting interstate commerce" in a substantial way.

The determination of this question involves an examination of the conditions surrounding the hosiery industry at the time the statute was enacted and also of the national emergency that existed at that time.

"While emergency does not create power, emergency may furnish the occasion for the exercise of power." Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 426, 54 S. Ct. 231, 235, 78 L. Ed. 413, 88 A. L. R. 1481. See also Wilson v. New, 233 U. S. 332, 348, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Block v. Hirsch, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Levy Leasing Co. v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595.

The emergency may also have the effect of rendering a transaction which in normal times would have only an indirect, incidental, and insignificant effect on interstate commerce, a matter of great moment and of powerful effect in times of great emergency. For example, in times when demand outruns production, child and sweated labor employed in the manufacture of goods for interstate transportation may not prove to be a substantial burden on interstate commerce, however reprehensible it may be morally; while such labor may have a very real, substantial, and burdening effect on interstate commerce in times when overcapacity, overproduction, cut-throat competition, unfair trade practices, and great economic chaos, resulting in unemployment, destroyed purchasing power, and lowered standards of living, are widespread and long-enduring evils that are causing banks to fail, industry to stagnate, and our national transportation systems to move haltingly with only a small percentage of their normal haul.

The general situation that confronted the country at the time the National Recovery Act was passed may well be expressed in the words of Mr. Justice Brandeis in the dissenting opinion in the case of New State Ice Co. v. Liebmann, 285 U. S. 262, 306, 52 S. Ct. 371, 385, 76 L. Ed. 747: "The people of the United States are now confronted with an emergency more serious than war. Misery is widespread, in a time, not of scarcity, but of overabundance. The long-continued depression has brought unprecedented unemployment, a catastrophic fall in commodity prices, and a volume of economic losses which threatens our financial institutions. Some people believe that the existing conditions threaten, even the stability of the capitalistic system."

In an affidavit introduced by the defendant, Mr. Mettler, chairman of the code authority for the hosiery industry, and president of the Interwoven Stocking Company, gives a good picture of the hosiery industry in the United States during the years of the depression and at the time of the passage of the National Industrial Recovery Act. He said: "In the hosiery industry there are about 700 plants, located in about 40 states. * * * Based on the figures of the Code Authority I estimate for the year 1932 the total annual production in all branches of the hosiery industry approximately one hundred million dozen pairs a year, and the total wholesale value is between four hundred million and five hundred million dollars a year. * * * There are employed in the hosiery industry approximately a hundred and twenty-five thousand persons, earning upwards of eighty million dollars a year. The total capital investment of the industry is roughly estimated at over five hundred million. * * * A great majority of those engaged in the hosiery industry in the United States do an interstate business. * * * In common with

most industries in the United States, the hosiery industry suffered demoralization during the years 1930 to the middle of 1933. While the total number of dozens consumed held up remarkably well, the price per dozen steadily declined until practically the whole industry was operating at a heavy loss in the early months of 1933, and general disaster threatened. Their volume of working capital decreased, due to continuous selling below cost of production, and the low point was reached about February, 1933. In many instances huge stocks of finished goods were hanging over the market, due to overproduction, and employment of workers was declining rapidly throughout the industry. By competition many manufacturers attempted to keep their plants employed which led to constant series of wage cuts. Wage earners were not only reduced in hours of employment but in wages per hour to such an extent that in the seamless branch of the industry there were many plants operating with wages at or below six dollars per week of sixty or more hours of employment. * * * The conditions described were general throughout the industry and there appeared to be no possible means of relief due to the impossibility of securing concerted action throughout the industry. There is no doubt in my mind that but for the action taken by the Federal government in the form of the National Industrial Recovery Act we would have been confronted by industrial conditions in the hosiery industry which would have been more serious than anything we have ever seen. * * * Although there was a considerable demand for women's seamless hosiery from 1929 to 1933, the over-capacity of the industry prevented an intelligent operation."

The condition of complainant's hosiery business, as shown by its own testimony, was chaotic and dangerous.

Mr. Andrews, complainant's president, referring to the depression beginning in 1929, in his affidavit introduced by complainant says: "We had a meeting of our board stating that we could close our mill down and lose less money than under the declining market conditions then existing. This policy of continuing operation cost our company nearly one million dollars."

Mr. Wilson, the vice president, treasurer, and general manager of complainant, in his affidavit, described the situation in the following language: After stating that complainant had enjoyed a profitable and growing business from 1923 to 1929, "as a result of which we accumulated a surplus of some three-quarters of a million dollars," he said: "Beginning with the year 1930 the volume of our business began drastically to decline, but in the face of this debacle and the financial loss it involved we continued the operation of our plant and provided employment for a large number of our more than two thousand employees, with the result that at the end of the three years our surplus had not only been completely wiped out again, but the capital stock was depleted. However, during the period, through careful and frugal management we were able, by mid-summer of 1933, to reduce the cost of our production to a point where no loss was involved. In addition to this we had provided more machinery and continually increased our production and increased the number of our employees steadily throughout the depression."

Mr. Vance King, secretary and assistant treasurer of complainant, states the situation as follows: "Unfortunately our company is not in as strong financial condition as many of our competitors. Since the business crash in the fall of 1929 our operating losses have been as follows: 1930 $200,000; 1931 $325,000; 1932 $100,000, 1933 broke even. * * * Our financial picture was one that was most unattractive from a banker's view point and in fact we could not secure a single dime of bank credit. * * * This company, unlike some of the competitors, declined to close its doors when stockings could only be sold at a loss, and took the attitude that we would fight this world-wide depression through or else we would die fighting, and with that spirit suffered losses in three years of 1930 to 1932 inclusive of $625,000, leaving our capital impaired. * * * We barely broke even in 1933 and we have made $12,000 in the first three months of this year, on an investment of more than two million dollars."

■ Congress faced this critical situation and sought to bring some measure of order and co-operation out of the economic chaos, in order that interstate commerce, as well as all other interstate and intrastate business, might be brought back to normal and the burdensome practices arising out of the great emergency be removed. It cannot be disputed that Congress has the power to regulate "transactions in and affecting interstate commerce" by removing discriminations against and burdens upon it and by measures to foster and promote its growth and insure its safety.

This was clearly pointed out in the case of Houston, E. & W. T. R. Co. v. United

States, 234 U. S. 342, 351, 34 S. Ct. 833, 836, 58 L. Ed. 1341, in which the court said: "Congress is empowered to regulate,—that is, to provide the law for the government of interstate commerce; to enact 'all appropriate legislation' for its 'protection and advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L. Ed. 999, 1001); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U. S. 691, 696, 697, 26 L. Ed. 238–240); 'to foster, protect, control, and restrain' (Second Employers' Liability Cases [Mondou v. New York, N. H. & H. R. Co.], 223 U. S. 1, 47, 53, 54, 32 S. Ct. 169, 56 L. Ed. 327, 345, 347, 348, 38 L. R. A. (N. S.) 44, 1 N. C. C. A. 875)."

The evidence in this case, relative to the condition of the hosiery industry and methods of operation prior to the enactment of the National Industrial Recovery Act, points with compelling force to the conclusion that only by the means of some such legislative action as the National Industrial Recovery Act could this industry, which was typical of the great majority of industries in the country at the time, have been put on a sane and profitable basis.

The general chaotic condition of the industry has been pointed out in the excerpts from the testimony hereinbefore quoted, but it is interesting to note specially how complainant in this case was endeavoring to meet the situation and the results of such endeavor.

The complainant, as shown by its own evidence, had been losing heavily from the beginning of the depression up to the time of the discussion of legislative relief and the final enactment of the National Industrial Recovery Act. Its secretary and assistant treasurer testified that it had lost $625,000 in the years 1930, 1931, and 1932, about broken even in 1933, and made profits during the first four months of 1934. Though losing heavily during the three years 1930 to 1932, inclusive, complainant, according to the affidavit of its vice president, treasurer, and general manager, "continued throughout the years of the depression to add as financially able to our productive capacity." It appears, therefore, that without regulation, complainant, and doubtless the majority of others engaged in the hosiery industry, were trying to avoid the ruin that was impending, by the futile increase of productive machinery, where there was already overcapacity, by reducing wages which were already depleted almost to the point of the exhaustion of purchasing power; and by severest cut-throat competi-

tion, resulting in sales below actual cost of production.

These are the very evils that added so materially to the economic confusion and business failures throughout the country, and which, if continued, could only cause further disaster. On account of the Anti-Trust Act, manufacturers engaged in interstate business could not, or thought they could not, or at least did not, co-operate in a manner to overcome these evils and naturally were doing individually all they could to preserve their own businesses, regardless of the effect on others.

If these conditions had been permitted to continue, it is not too much to say that a large number of industries would have ended in bankruptcy and that the reduction in output of industry, together with the lowered purchasing power due to reduced wages and unemployment, would have very seriously affected interstate commerce, inasmuch as the greater part of the products of industry move in interstate commerce. This is very forcefully pointed out in the case of Appalachian Coals, Inc., v. United States, 288 U. S. 372, 53 S. Ct. 471, 478, 77 L. Ed. 825, in which the court say: "When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry."

Congress, therefore, had ample evidence before it to justify the exercise of its regulatory powers, even over intrastate processes, for the purpose of removing burdens from and of fostering and promoting interstate commerce, by the authorization of codes like the one contested in this case.

Where interstate commerce is affected, it is not a question as to whether the affecting cause is a transaction in interstate or intrastate commerce, or an intrastate process, or intrastate understanding or combination, but a question as to whether or not the cause really and substantially affects interstate commerce.

As held in the Shreveport Case, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341, and later in the recent case of State of Florida v. United States, 54 S. Ct. 603, 78 L. Ed. 1077, decided April 2, 1934, the Interstate Commerce Commission, under authority granted by Congress, may require the removal of discriminations against and unjust financial burdens upon interstate commerce caused by intrastate rates on purely intrastate commerce. It would seem that the principle laid down in

these two cases covers the principle involved in the case at bar. The principle, it is submitted, in its broadest outline, is that whatever affects interstate commerce in a substantial and direct way may be regulated by Congress, regardless of whether the affecting cause is a transaction in intrastate commerce or an intrastate process or agreement. Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Tagg Bros. & Moorhead v. U. S., 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; U. S. v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; Federal Trade Commission v. Royal Milling Co., 288 U. S. 212, 53 S. Ct. 335, 77 L. Ed. 706; Second Employers Liability Case, 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791; Caminetti v. U. S., 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168; Minnesota Rate Case, 1913, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Railroad Commission v. Chicago, B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Local 167 v. U. S., 54 S. Ct. 396, 78 L. Ed. 804, decided Feb. 5, 1934; Voehl v. Indemnity Ins. Co., 288 U. S. 162, 53 S. Ct. 380, 77 L. Ed. 676, 87 A. L. R. 245; Texas v. Standard Oil Co., District Court Travis Co., Texas, decided Dec. 1933; Victor v. Ickes, District of Columbia Supreme Court, decided Dec. 1, 1933; U. S. v. Spotless Dollar Cleaners (D. C. S. D. N. Y.) 6 F. Supp. 725, decided March 31, 1934; Alabama v. U. S., 279 U. S. 229, 49 S. Ct. 266, 73 L. Ed. 675; U. S. v. Patten, 226 U. S. 525, 33 S. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815.

"It is clear * * * if Congress deems certain recurring practices, though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint." United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 408, 42 S. Ct. 570, 582, 66 L. Ed. 975, 27 A. L. R. 762.

In the national emergency, the situation had to be looked upon as a whole. The transactions of an industry, or of a single unit, or of a fractional part or single process of such unit, could not be examined with the technical nicety of scientific analysis in an economic vacuum to determine whether they were interstate or intrastate, but they had to be considered in the light of all the pressing necessities of the time and in their relation to all other industries and their actual effect on interstate commerce.

The hosiery industry is principally engaged in interstate business, which constitutes the stream of interstate commerce and supplies the articles of which it consists. Whether the industry obeys its Code or not will have a substantial and direct effect on that part of interstate commerce which depends upon its products, and Congress, acting through the President, has so found. If members of the industry be permitted to disregard the Code, or a part of it, at will, then enforcement would be a farce and the unfair practices of the unscrupulous would discriminate against the obedient and all the evils sought to be removed would reappear, burdening and obstructing interstate commerce in the manner heretofore described.

The Supreme Court has held that: "When the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act [15 USCA § 1 et seq.]" (Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 310, 45 S. Ct. 551, 556, 69 L. Ed. 963), which means, of course, that such acts are subject to congressional control.

It would seem, therefore, under the rule above announced that Congress would likewise have the power to regulate manufacture or production when it is shown that the absence of such regulation would "restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets" or that such regulation would promote and preserve interstate commerce.

Congress has decided that the measures provided in the National Industrial Recovery Act are the best means to remove burdens from and to promote interstate commerce. Such judgment should not be lightly set aside. "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it. This court will certainly not substitute its judgment for that of Congress in such a matter unless the

148

relation of the subject to interstate commerce and its effect upon it are clearly nonexistent." Stafford v. Wallace, 258 U. S. 495, 521, 42 S. Ct. 397, 403, 66 L. Ed. 735, 23 A. L. R. 229.

It has been argued that the constitutionality of the act was at least doubtful and that therefore the interlocutory injunction should be granted to allow a final determination of the question, before the institution of criminal proceedings.

It must be borne in mind that the National Industrial Recovery Act is an emergency measure which by its own terms expires in two years after the date of its enactment, June 16, 1933, or sooner if the President, by proclamation or the Congress by joint resolution, decide the emergency has ended, and that therefore it now has less than thirteen months to run. If the court, after finding the law to be valid, should grant such injunction, it would amount to a virtual nullification, since the law would probably cease to be a law before a final determination could be had in the appellate courts. This would discriminate against those who obey the law in favor of those who flout it. If the law is invalid or complainants have not violated it, they can be fully protected by their defense in the criminal proceeding.

Furthermore, a court cannot lightly hold up the enforcement of a law regularly enacted nor declare it to be unconstitutional unless it clearly appears to be so. "A due respect for a co-ordinate branch of the government requires that we shall decide that it has transcended its powers only when that is so plain that we cannot avoid the duty." Trade-Mark Cases, 100 U. S. 82, 96, 25 L. Ed. 550.

An order has been entered denying the motion for an interlocutory injunction and dismissing the bill.