## STATE ex REAMS v DUSHA

Ohio Common Pleas, Lucas Co

No 140434.   Decided Oct 20, 1934

Oscar A. Brown, Assistant Attorney General, Columbus, and Arnold F. Bunge, Assistant County Prosecutor, Toledo, for plaintiff.

U. G. Denman, Toledo, for defendant.

## OPINION

By STAHL, J.

It is the claim of the defendant that the Code so established and approved by the President does not authorize the fixing of prices at all, but the court is of the opinion that §§4 (a), (b) and (c), and §5 are intended to and do authorize the fixing of a minimum retail price. Indeed, it seems to the court that except for the policing of the Division and the enforcement of the various rules above referred to, the only matter that can affect the industry at all is the

fixing of minimum prices. In his recent address to the country President Roosevelt referred to price fixing as one of the important functions of NRA, so that it therefore appears that it is the opinion of the President that the power to fix minimum prices does exist.

It is further contended that NRA does not authorize the creation of a Code giving a power to fix prices.

The court has been referred to a number of cases in which the power to fix prices is doubted, and to the case of Mississippi Valley Hardwood Company et v William Mc-Glanahan, U. S. District Attorney, recently decided by the United States District Court for the Western Division of the State of Tennessee. In this case it is directly held that NRA does not authorize the fixing of prices. It is said, "There is no mention in the Act itself of price-fixing or price protection. The Act itself authorizes the various industries to compile codes of "fair competition" which becomes law on the approval of the National Recovery Director. The words "fair competition" by a long series of judicial decisions have been fully defined. These definitions do not include price fixing. To hold that Congress, in the National Recovery Act, has fixed a minimum price by implication, is to carry judicial construction too far. The court concedes the power of Congress to fix prices, under certain circumstances, on goods moving in interstate commerce. There is nothing in the NRA to show that such was the intention of Congress. The term "fair competition" negatives any such construction."

It is true that NRA says nothing about "price fixing." Neither did it say anything about any of the other matters that may be required to be put into the various Codes. The general purpose of Congress is declared, and it is left to the President "to fill up the details." It is easily conceivable that fixation of prices may in some instances at least, be the essential factor in effectuating the purpose of NRA. It would seem as legitimate to fix the price of a loaf of bread as to fix the size of a loaf of bread, as was done in the case of Allion v The City of Toledo, 99 U. S. 416.

The President was commissioned by the country, and he was authorized by Congress, to endeavor to extricate the country from the conditions creating the necessity for NRA. That duty involves the exercise of executive functions of stupendous importance. NRA substantially gives to the President the power to adopt such Codes as "in the opinion of the President" ought to be adopted. The opinion of the President

dent in relation to a problem involving such intricate complications and of such vast importance ought not lightly to be considered by the courts when the President's authority is challenged by a single individual or an industry. Section 4 (a) of NRA provides that the President may enter into agreements with persons engaged in industry, relative to such industry, and Section (b) provides, whenever the President shall find that destructive wage or price cutting or other activities contrary to the policy of this title are being practiced in any trade or industry, he may by proper licensing or refusing to license, correct such claimed evil.

It is provided that §4 shall exist for one year and then cease to be valid, and it is argued that the program of price fixing is confined to that period only, but it seems to the court that that power was given temporarily to the President until Codes might be established, and that the full power was given to the President to deal with the problem in such a way as would appear to him to be necessary in order to accomplish the purposes and intent of NRA, including price fixing if the President should conclude that to be proper and necessary.

The fact that the President has approved a Code, which does authorize the fixing of minimum prices, and the fact that the President in his address to the country has so stated, it seems to the court, should be taken into consideration. The court is, therefore, required to hold that NRA does authorize the fixing of minimum prices by the Code Authority.

It is further claimed that if the fixing of minimum prices is authorized by NRA and the Code, such provision is unconstitutional. It is claimed that NRA is unconstitutional because it delegates legislative authority to the President. In Richmond Hoosier Mills v Camp, 7 F. Supp. 141, it is said: "Of course, it is settled that legislative power of Congress cannot be delegated, but it is equally well settled that Congress may declare its will, and, after fixing a primary standard, devolve upon administrative officers the 'power to fill up the details' by prescribing administrative rules." It has therefore been held directly by a number of decisions of the United States Court that this is done by NRA, and that NRA is not invalid because of the delegation of authority to the President. It is equally clear that the delegation of power under the Ohio Industrial Recovery Act is not unconstitutional.

When it is considered that NRA came into being as a result of an emergency; that

it is to expire at a given date or sooner if the President by proclamation declares that the emergency is over, and that its purpose is to strengthen and give order to the weakened and disordered industry and finance of the United States, which weakened and disordered condition certainly did affect the free flow of interstate and foreign commerce which if continued might ultimately cause the "wells of commerce to go dry", it might with reason, it seems to the court, be asserted that the Federal power could be exerted under the Commerce Clause of the United States Constitution, and this case come within the jurisdiction of the United States Courts. The reasoning of the court in Home Building & Loan Association v Blaisdell, decided January 8, 1934, S. Ct. Vol. 54, p. 231, United States v Spotless Dollar Cleaners, 6 F. Supp., 725. and Richmond Hoosier Mills v Camp, 7 F. Supp., 139, become interesting, but it would avail nothing for this court to determine that question, except that it might throw some light upon the scope of the Ohio Industrial Recovery Act.

Both NRA and the Ohio Industrial Recovery Act declare that an emergency exists which requires the adoption thereof. It has frequently been said by courts that this legislative declaration has great weight in the determination of the court, but in addition, as stated by Knox, J., in the Spotless Dollar case, "No sane man can deny that a national economic emergency of great severity was in existence at the time of the enactment of the statute."

In Home Building & Loan Association v Blaisdell, 54 S. Ct., 231, the court had under consideration a statute of the State of Minnesota, by the provisions of which a mortgagee is prohibited from foreclosing his mortgage for a given period, provided the mortgagor proceed as therein provided. This Act declared that an emergency existed requiring its passage, and that it shall end with the end of the emergency. Its constitutionality was attacked upon the ground that it violated the provisions of the Constitution of the United States prohibiting the State from passing any act which impairs the obligation of a contract. The Supreme Court of the United States sustained the statute. It said: "While emergency does not create power, emergency may furnish the occasion for the exercise of power. Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed. The constitutional question presented in the light of an emerg-

ency is whether the power possessed embraces the particular exercise of it in response to particular conditions. The economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not follow that conditions may not arise in which a temporary restraint of enforcement may not be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the community."

This "reserved power" of the State is defined in Nebbia v People of State of New York, 54 S. Ct., at 510: "Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government."

But it is said that even in an emergency the State is without power to fix prices. In Nebbia v People of State of New York, 54 S. Ct., 505 the Supreme Court of the United States had under consideration the statute of the State of New York fixing the price of milk, which statute was attacked as being unconstitutional in that it violated the due process clause of the Constitution of the United States.

The condition of the milk industry in the State of New York is set forth as a part of the facts in the case, and speaking with relation to such condition the court on page 510 says: "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid

614

for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts." And speaking directly on the question of the power to fix prices, as is done by the New York Act, the court says: "But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago." And on page 517, the court says: "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or **demonstrably irrelevant** to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

The police power of the State constitutes really the "inherent power" of government. "Its foundation," says Judge Johnson, of the Supreme Court of Ohio, in **State ex v Creamer, 85 Oh St at page 398,** "is the right and duty to provide for the common welfare of the governed."

If a regulation as to price may be sustained in relation to a particular industry because of the peculiar status of such industry, as was held in the New York Milk case, it seems to this court that in an emergency that involves the entire industry of the country, a temporary regulation of price in the interests of the public may be provided for. If the regulation be relevant to the policy adopted by the Legislature, and reasonably constituted to accomplish the end sought to be obtained, it will be

upheld. Such is the holding of the Supreme Court of Ohio in **List v Burley Tobacco Growers' Cooperative Association, 114 Oh St 361.**

It is urged, however, that the Retail Coal business is an industry disassociated from the general industries of the country, and that, therefore, a regulation of price in a specially limited area cannot affect the general purpose of NRA or the Ohio Industrial Recovery Act, but, as stated in Richmond Mills Co. v Camp, 7 F., Supp., 147, "In the national emergency, the situation had to be looked upon as a whole. The transactions of an industry, or of a single unit, or of a fractional part or single process of such unit, could not be examined with the technical nicety of scientific analysis in an economic vacuum to determine whether they were interstate or intrastate, but they had to be considered in the light of all the pressing necessities of the time and in their relation to all other industries and their actual effect on interstate commerce." This reasoning, in the opinion of the court, applies to the problem here involved.

This court neither approves nor disapproves the National Recovery Act, nor the Ohio Recovery Act, nor the methods of procedure thereunder. With that this court has nothing to do. The sole question under consideration here is the question as to whether or not the power exists to do the things that have been done, and I quote with approval from the opinion of the court in the Spotless Dollar Cleaners case, above referred to. "I agree with the proposition announced by the Supreme Court, and here called to defendant's aid, that an emergency is incapable of conferring power, previously nonexistent, upon its victim. At the same time, it must be said that the victim, in an effort to extricate himself from his predicament, and to survive, can use his latent strength to the full. The struggle that is put forth may be ill-timed and awkward; it may not conform to precedent; and it may eventuate in utter futility, so far as the object to be achieved is concerned, but the strategy of a battle within the limits of strength belongs to the authority in command. And who can rightly say, with assurance that governmental price fixing, when confined to transactions in interstate commerce, is not a means reasonably adapted to legitimate ends which Congress seeks to serve?" In Nebbia v People of the State of New York, 54 S. Ct. at page 516, the court says: "With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward

it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." The court has, therefore, had the opinion that it is its duty to hold valid the fixing of minimum prices, as has been done in the case at bar.

With regard to the other claimed violations of the Code, the testimony is in dispute. Evidence offered by the Prosecuting Attorney tends to support the claim of the plaintiff, but this is denied by the defendant as the same relates to the number of hours that the laborers are required to work, and the amount of pay given to them. And there may be some question as to whether the giving of tickets and similar matters, has been in conformity with the provisions of the Code, but the court finds that the defendant, Dusha, has invariably given true weights and furnished the kind of coal represented as being sold.

In relation to these matters the court might well deny the injunction, because it does not appear to the court that any substantial violation of them is likely to be made by the defendant, but the court is of the opinion that it has the power within its discretion, to grant an injunction to prevent future violations even though it be established that violations have not heretofore taken place, and that it is likely that no violations will take place in the future, and the court is of the opinion that in view of the consequences to the public and the public right in the matter, it should grant such an injunction.

The defendant sought to introduce evidence to prove that the amount fixed as a minimum price is unreasonably high, but the court refused to hear such testimony, believing that it is the duty of the defendant first to seek to have a correction made by appeal to the higher Code Authorities, and that this court is without power to determine that problem until after such appeal has been made and heard. The Code permits an informal appeal by any person affected by the order to be made to the National Code Authority or to the Administrator, or directly to the President of the United States. The court is of the opinion that if the claim that excessive prices is being charged under the Code in the Toledo area is brought by any one to the attention of the President or the Administrator, it will be immediately investigated, and if the price is found to be excessive, correction will at once be made. This determination can be made without delay, and the value of such right of informal appeal presented to the country generally.

The injunction as prayed for in plaintiff's petition will be granted.