## DEFENSE SUPPLIES CORPORATION v. UNITED STATES LINES CO. et al.

District Court, S. D. New York.

Sept. 7, 1944.

Horace T. Atkins, of New York City (Horace T. Atkins and William Weymar, Jr., both of New York City, of counsel), for libelant.

James B. M. McNally, U. S. Atty., and Burlingham, Veeder, Clark & Hupper, all of New York City (Edward L. Smith, Norman M. Barron, Herbert M. Lord, and William J. Tillinghast, Jr., all of New York City, of counsel), for respondents.

KNOX, District Judge.

This case is before the Court upon an agreed state of facts, and they may be summarized as follows:

The steamship, Robert Morris, is a cargo vessel owned by the United States. On or about June 24, 1942, she lay at Fremantle, Australia, and took on board 9143 bales of wool in apparent good order and condition. This was done at the instance of the War Shipping Administration, acting for the United States. The wool was destined to the United States for delivery at New York or Boston, as might be directed by Defense Supplies Corporation, its absolute owner. Bills of lading were issued to libellant by United States Lines Company, as agent of War Shipping Administration, acting upon behalf of the United States.

Defense Supplies Corporation came into existence at the request of the Federal Loan Administrator, with the approval of the President, pursuant to Section 5d(3) of the Reconstruction Finance Corporation Act, 15 U.S.C.A. § 606b(3), in order to aid this Government in its national defense program, and to produce, acquire, carry, sell, or otherwise deal in strategic and critical materials, as defined by the Chief Executive of the nation, and to perform all other functions authorized by said Act, and as set forth in its Charter.

By the terms of the latter, the Corporation is exempt from all taxation then, or which might thereafter, be imposed by the United States or any other public authority, with the exception that such real estate as might be owned by it is subject to state, territorial, county, municipal or local dues or assessments. The corporation is specifically designated as "an instrumentality of the United States Government and (as such) is entitled to free use of the mails; and is possessed of the privileges and immunities that are conferred upon Reconstruction Finance Corporation by virtue of Congressional enactments. All of its corporate stock is owned by Reconstruction Finance Corporation, and its stock in turn, is wholly owned by the United States. Defense Supplies Corporation is to continue in existence until dissolved by Reconstruction Finance Corporation or by Act of Congress."

The wool in question was purchased by libellant for war emergency stock pile purposes, and that commodity was recognized as a critical and strategic material as defined by the President.

Other cargo on board included the following items:

Four bales of wool consigned by the Commonwealth of Australia, Central Wool Committee, consigned to libellant at Boston;

585 bales of wool, shipped by the same consignor to British Purchasing Commission at New York;

622 bales of wool, similarly shipped to the order of various commercial banks at Boston and/or New York;

32 cases of mother of pearl shell, shipped by private interests, and consigned to a commercial bank, for account of a private importing concern at New York;

One boxed chronometer shipped by United States Naval Supply Depot on a government bill of lading, freight free, and consigned to the United States Naval Observatory at Washington, D. C.;

A large quantity of cakes, cathodes, wire bars, ingots, and slabs of copper shipped from certain South American ports by Metals Reserve Company (a Government war agency) and consigned to itself at New York.

Copper, like wool, is classified by the President as a strategic and critical material. It should also be stated that the wool consigned to the British Purchasing Committee was intended for use by the

British Government in the prosecution of the War.

The wool consigned to libellant, on delivery in New York, showed fresh water damage received on board the ship in excess of $10,000.

Prior to shipment of its cargo, libellant had insured the same with a number of marine underwriters. Claim being made against them on account of the damages, the insurance carriers advanced libellant the aggregate sum of $21,940.32 as a loan, and not as payment of any claim, said loan being repayable only out of any net recovery that libellant might make from any vessel, carrier, bailee or others upon or by reason of any claim for loss or damages to the property.

As security for the advance so made, libellant pledged such claims, as it might have, against other parties, with respect to the injury to the wool, with the insurance carriers. It also guaranteed that it was entitled to enforce the terms of the transportation contracts covering the shipment, and authorized the use of its name by the insurance companies in their prosecution of such claims as they might have against the United States for a recoupment of their losses.

Thereafter, on September 3, 1943, the instant libel was filed.

The parties have also stipulated, for such bearing as they may have upon the status or character of the Robert Morris, as a public or merchant vessel within the meaning of the Public Vessel Act, 46 U.S.C.A. § 781 et seq., and the Merchant Vessels Act, 46 U.S.C.A. § 741 et seq., the following facts:

In the general operation of the Robert Morris, and upon the voyage in question, the War Shipping Administration made its arrangements, including charges for and collection of freight moneys covering the receipt, transportation, and delivery of cargo, and made its expenditures, including protection and indemnity insurance coverage, in connection with cargo owned by libellant, on the same basis as it made arrangements and expenditures with respect to cargo received, transported and delivered for private corporations, partnerships or citizens of the United States.

It is also agreed that, if respondent is to have a decree, the libel shall be dismissed with costs. Should libellant prevail, it is to have a decree for $10,000, with costs, but without interest.

Upon the exceptive allegation of respondent, the following points are raised:

(a) Defense Supplies Corporation cannot maintain a suit against the United States because (1) as a governmental agency, it can acquire no enforcible rights against them, and (2) the property involved was government owned.

(b) Under the provisions of the Suits in Admiralty Act (46 U.S.C.A. §§ 741–752), and on the facts that are here made to appear, viz., that the Robert Morris was employed as a public instead of a merchant vessel, the Court is without jurisdiction.

The character of the arguments and briefs of counsel for the respective parties has been such that the Court, if time permitted, would like to respond with an opinion dealing with each phase of the case as it has been presented. This being impossible, under existing conditions, my decision will briefly be stated.

Being an instrumentality of the United States Government, it is certain that libellant, had its cargo been uninsured, would have had no cause of action against respondent for such injury as came to the wool as a result of the ship's negligence. United States Grain Corporation v. Phillips, 261 U.S. 106, 113, 43 S.Ct. 283, 67 L.Ed. 552. The only reason for libellant's existence, like that of the United States Grain Corporation, was that the Government, through its corporate form, might more readily and easily than would otherwise be possible, engage in activities that were designed and intended to be part and parcel of the war effort. As between itself and private interests, the corporation was at liberty to sue and be sued, but it is hard to conceive that there ever was any thought or intention upon the part of any one that it could hold the Government to liability for anything that the latter might do. If libellant were permitted to do so, it might easily become an obstructive and annoying nuisance, instead of wholeheartedly discharging the vital functions for which it was created.

Title to the wool in question, although it stood in the name of libellant, was intended solely for the Government's emergency stock pile—the creation of this was distinctly a war measure. The wool, all technical questions of title aside, was

in reality the property of the United States, and was to be used for the benefit of the Government, at such time and manner as the appropriate official might decide upon. That this must be so seems abundantly clear from the decision of the Supreme Court in Inland Waterways Corporation v. Young, 309 U.S. 517, 524, 60 S.Ct. 646, 84 L.Ed. 901, where funds of a non-public character, and nominally owned by a governmental agency, were held, from a practical standpoint, to be those of the United States. Any loss of libellant, just as losses of Inland Waterways Corporation, would ultimately be borne by the Government. Furthermore, if the United States were to be held liable to libellant for the loss that here took place, it would appear that the insurance of the goods was of no real advantage to any one save the underwriters—they would have their premiums and the Government would carry the risk which should be theirs.

Having reached these conclusions, it is unnecessary to pass on the other exceptions that were taken to the libel.